Kennon Tubbs MD
13584 Carolina Hills Court
Draper, Utah 84020
(801) 502-3473
jailmd@gmail.com

July 17, 2017

Cindy Maag R.N.
Eckenrode and Maupin
11477 Olde Cabin Rd., Ste 110
St. Louis, MO 63141
(314) 726-6670
(314) 726-2106 (fax)

**In regard to David Severance vs Chastain, ET AL:**

Dear Mrs. Cindy Maag:

I am a family practice physician and have practiced at the Utah State Prison for 16 years. I am currently the Medical Director for ten county jails throughout Utah and Wyoming. I am a certified provider by the National Correctional Commission on Health Care (CCHC-P). I supervise three Physician Assistants who provide the majority of patient care at these facilities and have extensive experience with providing patient care and medical supervision of correctional facilities. I understand the expectation of care to be provided by nursing staff, mid level providers, and physicians in the correctional setting. As part of my experience and work

1

**EXHIBIT K**

history, I understand and regularly apply the National Commission on Correctional Health Care standards for health services in jails.

I have reviewed the following records and documents of Mr. David Severance with respect to this lawsuit.

1. Fourth, Third, and Second Amended Complaint

2. Electronic Medical Records 2012-2016

3. Miscellaneous Medical Records, Dental Records and Consultations 2007-2014

4. Medical service requests 2012-2014

5. Medical Administration Records 2012-2014

6. Grievance File

7. Deposition Joyce Chamberlin

8. Deposition Hollie Hild

9. Deposition, exhibits, and interrogatories Dr. Mark Bradshaw

10. Deposition Todd Renshaw

11. Deposition David Severance

12. Informal resolution requests MDOC 02016-2020,2030-2036,250-2056

13. Deposition Robert Paolillo

14. Deposition Ernest Jackson

15. Deposition, exhibits and interrogatories Tonya Long

16. Deposition Larry Keithley

17. Deposition, exhibits and Interrogatories Brett Jeschke

18. Deposition, exhibits and Interrogatories Glen Babich, M.D.

19. Severance trial exhibit 3 chronology exhibit

I have the expertise to evaluate the accuracy and reliability of these records. These records are the type usually relied upon by reviewers such as myself. These records appear to be reliable. As correctional medicine becomes increasingly complex it is important for reviewers, like myself, to keep the documented interaction between a patient, healthcare institution, and providers at the heart of the review process. While it is true to some extent all patient interactions are unique, there are specific medical practices a nursing staff and the treating provider would be expected to provide to meet the applicable standard of care. I have specifically reviewed these records to determine whether, within a reasonable degree of medical certainty, the standard of care was met with respect to treatment of Mr. Severance while incarcerated by the State of Missouri Department of Corrections at the Western Missouri Correctional Center. I have also evaluated the records as to whether the available evidence indicates that the nurses and providers involved exhibited deliberate indifference to Mr. Severance's serious medical need. The above records discloses the following facts in summary:

3

On April 26, 2012, Mr. Severance presented to the infirmary with a jaw injury. He was ordered to stay in the TCU and have an x ray the following morning.(EM0018)

On April 27, x rays showed a wide open fracture of the right mandible.(EM0023) Severance was referred to Dr. Robert Paolillo, an oral surgeon, for consult. An open reduction with internal fixation of the right angle of the mandible was repaired.

During the postoperative phase in May, June, and July of 2012, Mr. Severance developed redness, swelling and infection in the operative site and was treated with multiple antibiotics both oral and intravenously.

On July 18, 2012, Mr. Severance was operated on by Dr. Paolillo again for removal of the upper metal jaw plate and screws. The inferior plate was found to be adequate and was left in place. A new 2mm plate was then reattached with 12mm bicortical screws. The jaw was then wired closed.(EM3274)

Throughout the next 8 months Mr. Severance required significant dental evaluations and dental care due to non healing jaw fracture, poor dentition and dental caries. He also complained of infections and swelling, and was placed on multiple antibiotics during this time.(EM2785)

On April 3, 2013, Mr. Severance was evaluated again by Dr. Paolillo. He was found to have a slow healing fracture site of the right mandibular body. Dr. Paolillo recommended removal of hardware with possible replate and placement of an allogeneic graft. Dr. Paolillo

4

counseled Mr. Severance and further noted that he did not understand,"*why patient continues to have problems: ie., trauma, poor health, and nutritional problems. Planning to remove foreign bodies in fracture site and decide whether to replace and Dgraft,*(Dental bone graft) *or leave as it...*"(EM3211)

On April 11, 2013 Dr. Paolillo removed all hardware from Mr. Severance reasoning that he was allergic to the metal plate.(EM3199)

Throughout the months of May and June 2013 Mr. Severance was seen multiple times for surgical follow up and reevaluation.

On July 9, 2013 Mr. Severance reported. "*I've got a migraine headache, I'm so cold. I cannot see out of my right eye, Just a small black dot.*" Nursing evaluation noted right sided weakness and slow to respond. Dr. Hakala was contacted and Mr. Severance was transported via ambulance to CRMC.(EM0458)

On July 10, 2013, Dr. Paolillo noted, "*Will talk to OMF REP for possibility of plastic fixation plate and screws.*"

Soon after, Mr. Severance began to experienced multifactorial significant health issues unrelated to his nonunion mandibular fracture.

Mr. Severance has a significant past medical history that poses long term and short term surgical health risks. These include the following:

5

1. Basal Cell Carcinoma on face and nose

2. Hypertension

3. Severe coronary heart disease: Triple vessel disease with poor distal targets for regrafting.

4. Chronic angina multiple episodes

5. Prior multiple myocardial infarctions number uncertain.

6. Ischemic cardiomyopathy with mild enlargement of the right atrium

7. Acid reflux

8. Arthritis

9. Sleep apnea

10. Insomnia

11. Traumatic brain injury from a Motor Vehicle Accident 16 years ago with post headaches and Grand Mal seizures (EM1000)

12. Restless leg syndrome

13. Asthma

14. Chronic obstructive pulmonary disease (COPD)

15. Bipolar I disorder

16. Unspecified schizophrenia (EM3332)(EM1000)

17. Self reported, "terminal coronary disease"

18. Prior surgery "5 way" coronary artery bypass

19. Prior surgery "3 way" coronary artery bypass

20. Prior surgery "2 way" coronary artery bypass

21. Several coronary artery stent placements(EM3336)

22. Seizure disorder

23. Memory problems

24. Polysubstance drug abuse

25. 80 pack year smoking history and current smoker.

26. Poorly controlled Diabetes

27. Hyperlipidemia

28. Hypercholesterolemia

29. Chronic Jaw Pain with non union mandibular fracture.

30. Degenerative disc disease lumbar spine

31. Chronic back pain

32. Dental caries and overall poor oral dental health

33. Cerebral Vascular Disease

34. Stroke

35. Hemiplegia post stroke weakness.

36. Metal allergies or poor bone healing.

37. Wheelchair bound.

38. Bone splinters coming out spine.(EM0933)

In addition to his multiple medical problems, Mr. Severance was prescribed multiple medications to care for his needs. These included: (EM3036-3040)

1. Alpha Lipoic Acid 600mg

2. Aspirin 325mg

3. Beclomethasone inhaler

4. Buspirone 15mg

5. Carbamazepine 200mg

6. Fluocinolone nasal spray

7. Simvastatin 40mg

8. Trazodone 150mg

9. Triamterene 75mg

10. Hydrochlorothiazide 50mg

11. Albuterol HFA inhaler

12. Calcium carbonate 500mg

8

13. Tylenol with Codeine #3

14. Nitroglycerine 0.04mg SL

15. Ibuprofen 600mg

16. Isosorbide mononitrate 120mg

17. Metformin 1000mg

18. Omeprazole 20mg

19. Paroxitie 40mg

20. Mirtazapine 60mg

These medications were managed through chronic care clinics and multiple provider encounters during his incarceration.

Mr. Severance had multiple procedures and evaluations for other health concerns over the next 18 months that took precedence over his mandibular fracture. These included basal cell skin cancer surgery, dental tooth extractions, multiple emergency department visits, and hospital admissions for chest pain, coughing up blood, bone splinters and seizures.

On April 4, 2014, Mr. Severance was evaluated by Dr. Balcer cardiology with a transthoracic echocardiogram and stress myocardial perfusion scan. This showed an overall mildly abnormal study. Findings to suggest the possibility of a developing cardiomyopathic process which appears to be nonischemic in nature.(EM3358)

9

On June 10, 2014, Mr. Severance was informed that surgery was too dangerous due to his health status and the number of medications he was taking. Any surgery could or would be life threatening. He was still smoking 3-4 cigarettes a day and became angry.(EM3266)

It was determined that no further surgery would be done until a cardiology consult was obtained.(EM3190) In September 2014, Mr. Severance underwent a left cardiac catheterization for further cardiac evaluation. Ultimately, Dr. Balcer did clear Mr. Severance for surgery from a cardiology standpoint. Balcer stated, "Okay for surgery. Patient is at some increased risk but delaying surgery is not likely to reduce risk." DS/Balcer 044

Corizon's providers considered the multifactorial illnesses that Severance was diagnosed with. Corizon's providers also considered Dr. Paolillo's determination that the surgery was not urgent but was "a quality of life issue" (Pg 36/8 deposition). Dr. Babich and other providers evaluated the increased cardiac risks, poor pulmonary compliance, neurologic seizure activity, nutritional, and quality of life issues. Because of the two oral plating surgical failures in the past, it was unlikely of a good outcome with a third surgery. Due to past complications of the previous surgeries and the decreasing health of Mr. Severance, Corizion declined a third surgery. Though the first two surgeries were determined to be "necessary", a third surgery would be considered nonessential. This surgery could also be delayed until parole when risk of surgical complications would be the sole responsibility of the patient and not Corizon. Mr. Severance did

not have an urgent need for surgery. His airway was not compromised, he was maintaining his nutritional status, his pain was not debilitating. Pain management could be controlled with oral agents. It was with this understanding of Mr. Severance's overall health that the jaw surgery was not approved.

In the next several months Mr. Severance continued to have many multifactorial medical complaints and significant cardiac complaints of chest pain. He was seen in the emergency room on multiple occasions.

On March 2, 2015, Mr. Severance returned for a visit with Dr. Balcer, cardiology. Again a cardiac stress test was performed. The impression reads, "*1. Evidence of segmental ischemia identified by dobutamine MIBI single day imagine study involving the inferior, Inferolateral, and anterolateral segments. This is not concordant with the right coronary artery and left circumflex distribution. Transient cavitary dilation of the left ventricle with stress is present and supports underlying ischemia. 3. Moderately abnormal study. Overall this study is felt to indicate a moderate likelihood of the presence of hemodynamically significant segmental coronary artery disease, and that this time the patient appears to be at a moderately increased risk of future cardiac events. 5. Overall clinically significant interval worsening is identified."*
*(EM0917-0918)*

11

During the months of January through March 2015 Mr. Severance began refusing to treat his diabetes with insulin. He refused his medication on many occasions and ultimately refused to have his finger sticks done. Many chronic care clinics and patient visits were done in an attempt to improve Mr. Severance's overall health. Corizon providers encouraged him to stop smoking, control his diabetes, hypertension, and cholesterol. Mr. Severance continued to refuse insulin and continued to smoke increasing his risks for vascular disease and poor bone healing.

Mr. Severance was evaluated by Charles W. Chastain on April 16, 2015 and the assessment was, *"Multiple medical issues, most irresolvable, none immediately threatening. Cannot project life expectancy, probably several years. Forms completed, eligibility unlikely."* (GF 0007)

In a grievance filed on July 28th 2015 Mr. Severance reports, *"The hospitals gave me two years to live the last time I went in and I have lived ½ a year past that time, and the pain in my chest has increased a lot since then, I know I am dieing I can feel it..."*(GF0019)

Mr. Severance continued to file many grievances and requests for early parole throughout 2014 and 2015. In the grievances, he reports his fractured jaw as the primary request for early parole. He also repeatedly states that his heart condition and overall general health is very poor. The many grievances are all answered with a statement of,*"We rely upon the independent,*

*discretionary medical judgement of the site physicians to determine what care, medication, and treatment is needed."* (GF0001)

    Mr. Severance was released from prison on June 20th, 2016. He continued to have multiple medical problems related to his end stage pulmonary disease, neurologic seizures, and cardiac issues. He was seen at Mercy Hospital on multiple occasions. He was seen for his Jaw fracture on December 21, 2016 and a new CT scan of his jaw was obtained. The fracture was found to be 1cm of displacement. The Mercy Hospital team and Medicaid reviewed his case for surgery. No medical records were reviewed as to why the surgery was not done at that time. Mr. Severance reported that he could not find a doctor at Mercy who was willing to do the surgery. (Deposition Severance)

    On April 17, 2017 Severance was seen by Oral and Maxillofacial Surgery Clinic for his jaw fracture. They requested allergy testing for metal to determine his likelihood for surgery.

    On June 13, 2017 metal allergy testing was repeated twice. A 96 hour patch test was negative for all metal allergies. Though clinically Mr. Severance has had a reaction to the prior metal plates it is unclear if this was an allergic reaction or simply nonunion due to poor healing.

    On August 29, 2017 Operative reduction and internal fixation (ORIF) is planned for surgical repair using a bone graft.

Mr. Severance medical records were not available for review after he left the prison. Sometime after the decision for ORIF surgery was made, he had another significant cardiac event requiring yet another coronary bypass multivessel repair in late 2017. On the date of his Deposition March 8th, 2018 he stated that his current cardiologist reported that he would not be eligible for oral surgery for another 5 months due to his recent fourth cardiac multibipass surgery.

# EXPERT OPINION

# Mandibular Nonunion Fracture

It is my professional opinion that the Eastern Reception Diagnostic and Correctional Center, Missouri Department of Corrections and Corizon L.L.C. (through the health care professionals it contracted with namely, Charles Chastain, Glen Babich, Ernest Jackson, Tonya Long, and Joyce Chamberlin) provided appropriate medical treatment for Mr. Severance's mandibular fracture. The care provided was extensive and went beyond the normal care that would have been given in similar circumstances due to the multiple repeated complications and complaints for treatment by Mr. Severance. The initial care of plate placement occurred in a timely manner and met the standard of care. Due to Mr. Severance's many chronic medical conditions namely his diabetes, peripheral

14

artery disease, smoking, reported allergy to metal, poor dentition, his plate did not form a solid bony callus formation. Instead, his body formed an immune response to the metal and prevented healing at the fracture site. The care that was provided met the standard of care but the healing process is different in every patient. Mr. Severance has multiple medical problems and was not an ideal surgical candidate when Dr. Paolillo first operated on him in April 2012. With follow up operations his health continued to decline. This is evident in the many health care requests, chronic care clinics, requests for consultation, emergency room visits and hospitalizations in the four years to follow. The plastic plate Dr. Paolillo suggested was only a possibility and was never actually recommended as an emergent or urgent need for the patient. Dr. Paolillo reported in the medical record that it would be "as likely to leave the fracture as is". Dr. Paolillo in deposition stated that the surgical repair was necessary for optimal outcome to improve the quality of his life. However, when consideration for Mr. Severance's overall health there is no indication that a third surgery would be highly successful. In fact, due to the significant vascular disease found throughout Mr. Severance's body it is likely that poor healing in both a bone graft site and his jaw would occur. It is as likely a third surgery could cause more harm, pain and suffering to Mr. Severance without a successful outcome.

If the surgery was not necessary then Corizion would not have had Mr. Severance evaluated for the surgical workup. I agree with the decision by Dr. Babich to decline the surgery. Mr. Severance did not have a compromised airway, breathing, decreased nutritional intake, or signs of malnutrition. This surgery did have increased risks as determined by all cardiologist who evaluated him. He was cleared for noncardiac surgery noting only that the risk would not be improved by waiting to have the surgery. However, cardiac risks still were identified and likely complications could occur. Cardiology cleared Mr. Severance for noncardiac surgery, but the cardiologist did not comment on the likelihood of a positive outcome. He only implied that delaying the surgery would not improve his outcome.

A third surgery was deemed to be nonessential and at no time in the review process was there a clear indication for a third surgery that Corizon refused to provide Mr. Severance. I agree with Corizon, that a third surgery may have dire results. Mr. Severance is not a ideal surgical candidate. The jaw fracture was at that time and today, not life threatening. Mr. Severance maintained his body weight throughout the jaw fracture and did not become underweight. He was able to speak, eat, drink, and breath. These are the activities of daily living that the jaw and mouth must be able to do to be deemed "functional".

16

A further surgery would have placed Mr. Severance at high risk of complication including but not limited to death. Corizon did obtain surgical consult appropriately. Though the recommendation by Dr. Paolillo was to do a third surgery, I agree with Corizon that the surgical risks were too great.

## Cardiology

Mr. Severance has significant multivascular disease. These include coronary, neurovascular, and peripheral vascular issues. He has all the risk factors for severe disease coupled with a desire to continue smoking. Mr. Severance has diabetes, hypercholesterolemia, hyperlipidemia, hypertension, age over 50, male, sedentary lifestyle, stroke, prior myocardial infarction, and worsening findings on a recent stress tests. He also has severe pulmonary disease due to 30 years of smoking up to three packs per day. Poor perfusion with poor oxygenation are of grave concern when considering a significant oral surgery. Prior to oral surgery a cardiology consult would be required to clear Mr. Severance for jaw surgery. A cardiology and pulmonary diagnostic work up included cardiac stress testing, multiple EKG's, troponins, multiple chest x rays, pulmonary function tests, cardiology consultation, chronic care hypertension clinics, chronic care lipid testing, and chronic care cardiology visits. All testing was completed in a timely manner and the conclusions from the testing were appropriate. The work up

17

was complete. Mr. Severance has significant coronary artery disease. This will require lifelong monitoring, testing, repeat consultation, and possibly surgical intervention in the future. Corizon must consider the overall health of the patient prior to undertaking any elective invasive procedure such as oral surgery. The medical records of these facts is extensive and appropriate.

## Stroke

On July 9, 2013, Mr. Severance did present to the infirmary with symptoms consistent with a migraine headache. These symptoms progressed to a cerebral neurovascular complaint while being transported via ambulance to the hospital. He was triaged by the nursing staff, a physician was contacted immediately, and he was sent to the emergency room via ambulance. This is the standard of care for any cerebral vascular accident. All patients presenting with stroke like symptoms should be transferred emergently to a local facility for further diagnostic testing to rule out stroke. Corizon nursing staff contacted an ambulance and referred Mr. Severance to the nearest stroke hospital in an emergent manner, meeting the standard of care. Mr. Severance has significant vascular disease which predispose him to strokes. This disease also places

18

him at risk for a repeat stroke during elective oral surgery. Corizon provided appropriate stroke management to Mr. Severance on July 9, 2013.

## Conclusion

I agree with Corizons decision to decline repairing the nonunion fracture for the third time while Mr. Severance was incarcerated at the Western Missouri Correctional Center. A reasonable physician would conclude that a significant head and neck surgery to repair Mr. Severance's jaw could precipitate another myocardial infarction, cerebrovascular event, cardiopulmonary compromise or seizure activity. These are all life threatening consequences brought on by a procedure that is not guaranteed to benefit Mr. Severance. Though Mr. Severance is in pain from the nonunion fracture there is no guarantee that his pain would be improved from a third surgical procedure. Mr. Severance was provided first line standard of care therapy for fixation of his jaw fracture when the initial injury happened. The chronicity of the fracture not healing and the significant comorbidity of Mr. Severance's overall medical condition, there is doubt that a repeat surgery would be successful. There is also significant concern that the risks of the surgery would cause irreversible harm.

Mr. Severance has been released from custody for over two years and has not found a surgeon who will repair his fracture. The physicians he has sought care from

19

have reported that surgery would improve the nonunion fracture but have not deemed his surgery urgent or emergent. He is able to function to a reasonable degree with his current nonunion fracture. Given the nature of his multiple medical problems and history of poor healing, Corizon's decision not to undertake a third surgical intervention was appropriate. Mr. Severance was provided standard of care medicine by Corizon while he was incarcerated. It would be unreasonable to expect Corizon to place a patient at risk of further harm while charged with providing for his welfare. Corizon has made a proper decision within a reasonable degree of medical certainty.

I find no merit in the claims or statements made in the petition by Mr. Severance. The health care provided was extensive, compassionate and rendered in a timely manner. I reserve the right to modify this opinion if new factual information becomes available that would alter this opinion.

Sincerely:

Kennon Tubbs MD

*/s/ Kennon Tubbs MD/*